UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ | Civil Action No. 22- |
| ERIC A. ROJAS RODRIGUEZ ) | |
|     Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| OFFICER DANIEL PENNELLATORE, ) | |
| OFFICER THOMAS BISHOP, OFFICER PAUL ) | |
| ALWARD, OFFICER KEVIN MCCARTHY, ) | |
| the CITY OF WORCESTER, City Manager ) | |
| EDWARD M. AUGUSTUS, and CHIEF STEVEN ) | |
| W. SARGENT ) | |
|     Defendants ) | |
| ) | |
| _____ ) | |

COMPLAINT AND REQUEST FOR JURY TRIAL

<u>INTRODUCTION</u>

1.    This is an action in civil right for injuries inflicted by a Worcester police officer when he purposely sicced a vicious police dog on a restrained and unsuspecting man from behind without provocation or legal cause of any kind whatsoever. The victim, Eric Rojas Rodriguez, was kicked in the face, repeatedly punched while on the ground, and mauled by a police K-9 even though he was already handcuffed.  The officer then falsely and maliciously charged him with serious crimes based on fictional account of riotous and assaultive conduct. Mr. Rojas suffered what a treating plastic surgeon described as five lacerations with significant soft tissue damage (muscle injury) in the medial calf along with two posterior lacerations.  Plaintiff was disabled for months, unable to step on his left leg, was traumatized by the horrific experience, and subjected to great public embarrassment. The mauling resulted in significant scarring, atrophy and deformity to his left leg and calf.  He was accused of assault and battery on police, resisting arrest and disorderly conduct and disturbing the peace.  All charges except one, for disorderly conduct, were dismissed at the request of the Commonwealth and with the consent and agreement of members of the Worcester police department after a surveillance video and cell phone video of the incident surfaced that contradicted the falsehoods of the false police narrative.

2.    The Defendants City of Worcester, Chief of Police Steven Sargent, and City Manager
      Edward M. Augustus, III, are sued for policies, customs, and practices of tolerating
      unreasonable force and other misconduct by police officers, which caused officers to
      believe they could violate the rights of citizens without repercussions.  The said policies,
      customs and practices allowed Worcester Police Officers Pennellatore, McCarthy,
      Alward, Bishop and others to continue working despite the conduct from which this suit
      arises.

## JURISDICTION AND VENUE

3.    This action is brought under 42 U.S.C. § 1983 and § 1988 for violation of
      rights guaranteed by the Fourth and Fourteenth Amendments to the United States
      Constitution. Title 28 U.S.C. § 1331 and § 1343 provide jurisdiction over all federal
      claims, and 18 U.S.C. § 1367 provides supplemental jurisdiction over state law claims.

## PARTIES

1.    Plaintiff Eric A. Rojas Rodriguez, ("Mr. Rojas") is a resident of the Town of Spencer,
      Worcester County, Massachusetts.

2.    Defendant Officer Daniel Pennellatore, ("Officer Pennellatore") was at all pertinent times a
      duly appointed and sworn Worcester police officer.   He resides at 77 Irish Lane, Rutland,
      Worcester County, Massachusetts.

3.    Defendant Officer Thomas Bishop ("Officer Bishop") was at all pertinent times a duly
      appointed and sworn Worcester police officer.  Officer Bishop resides at 9 Founders Ct.
      Oxford, Worcester County, Massachusetts.

4.    Defendant Officer Kevin McCarthy ("Officer McCarthy") was at all pertinent times a duly
      appointed and sworn Worcester police officer.  Officer McCarthy resides at 9 Founders Ct.
      Oxford, Worcester County, Massachusetts.

5.    Defendant Officer Paul Alward ("Officer Alward") was at all pertinent times a duly
      appointed and sworn Worcester police officer.  Officer McCarthy resides at 9 Founders Ct.
      Oxford, Worcester County, Massachusetts.

6.    Defendant City of Worcester ("the City") is a duly chartered municipal corporation of the
      Commonwealth of Massachusetts with a place of business abode at 455 Main Street,
      Worcester, Worcester County, Massachusetts.

7.    Defendant Steven W. Sargent ("Chief Sargent") was at all pertinent times a duly sworn
      police officer and the chief of the Worcester Police Department ("WPD"). He resides in
      Worcester, Worcester County, Massachusetts.

8.    Defendant Edward M. Augustus ("Mr. Augustus") has been the chief executive officer of
      the City, with the job title of City Manager, since January 7, 2014. He resides at 63 Illinois

Street, Worcester, Worcester County, Massachusetts.

9.     All defendants other than the City of Worcester are sued in in their individual capacities

## FACTS

10.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

11.    At all pertinent times the City employed Officers McCarthy, Alward, Bishop and Pennellatore as duly appointed and sworn Worcester police officer ("WPD").

12.    The City also employed Chief Sargent, who exercised authority over the WPD officers and was a maker of policy governing standards of conduct and discipline within the WPD.

13.    As such he had the power to discipline, including the power to effectively recommend restrictions, dismissals of officers, and the power, authority, and duty to hold officers accountable for any use of unreasonable force and for misstatements of fact in official reports.

14.    Under the City charter Augustus was at all pertinent times the conservator of the peace within the City with hiring and firing authority over all City employees and power to discipline, to effectively recommend work restriction or dismissals of officers, and the power, authority, and duty to hold officers accountable for any use of unreasonable force and for misstatements of fact in official reports.

15.    At all pertinent times officers each individual defendant acted and/or failed to act as alleged in this Complaint under color of the laws, statutes, ordinances, and/or regulations of the Commonwealth of Massachusetts and/or of the City of Worcester.

16.    At all pertinent times Officers McCarthy, Alward, Bishop and Pennellatore were patrolmen in the WPD operations division.

17.    At all times material to this complaint Officer Pennellatore was a patrolman assigned to the WPD canine unit.

18.    At all times material hereto the Pennellatore had ownership, possession and control of a dog named Mattis ("K-9 Beebs"), a large male Belgium Malinois that Pennellatore kept at home, was registered to him, and that he deployed and handled on duty as a police canine.

19.    K-9 Beebs was trained as a dual-purpose police canine, to detect guns, explosives and to track, apprehend and bite civilians and suspects.

20.    As part of tracking and apprehension K-9 Beebs was trained to attack, bite and hold persons on command in a manner likely to cause bodily injury or severe bodily injury.

21.    K-9 Beebs was born, raised, and trained in a kennel and was selected as a working dog,

primarily based on the traits of aggression and strength.

22.   K-9 Beebs had been trained to track and apprehend suspects by utilizing what is commonly referred to in the canine field as the "bite and hold" technique.

23.   On command, Beebs, a dog trained to "bite and hold" immediately bites the targeted person, regardless of threat or level of resistance; it then continues biting to hold the person, and it renews the attack if the person manages to escape, until commanded to release by its handler.

24.   Unlike family pets, police dogs trained to bite and hold, (like K-9 Beebs) are trained to bite full-mouth, i.e., using the full capacity of the jaws and all 42 teeth, including incisors at the front of the mouth and molars in in the back order to strengthen the hold on a suspect.

25.   Dogs that bite full-mouth pose a heightened risk of serious injury to persons they apprehend and bite.

26.   Unlike other domestic dogs, Beebs was specifically trained to bite hard and to do so multiple times.

27.   Bites by trained police dogs such as Beebs are substantially likely to result in serious lacerations and other serious bodily injuries to others who come in contact with them.

28.   Medical literature has shown that bites from police K9's have been described more like shark attacks than nips from family pets.  See, e.g. When Police Violence is a Dog Bite, The Marshall Project, October, 2, 2020.
       www.themarshallproject.org/2020/10/02/when-police-violence-is-a-dog-bite

29.   Medical literature has established that the training of police K9's enhances the risk of serious injuries and invariably results in a higher incidence of medical care and hospitalizations than attacks by untrained dogs.

30.   As a result of his training, Officer Pennellatore knew that serious injuries in the course of apprehension by a police canine are common and to be expected, especially with a dog trained to bite with its full mouth.

31.   Although death from police canine encounters are not frequent, serious and even fatal injury are a foreseeable result of the use of this type of force.  See e.g., the case of Joseph Pettaway who died in July of 2018 in Montgomery, Alabama after being bitten by a police dog which severed an artery in his groin.
       www.themarshallproject.org/2020/10/02/when-police-violence-is-a-dog-bite

32.   The use of a "bite and hold" apprehension with a dog such as K-9 Beebs is a use of force likely to result in serious bodily injury; or in the alternative it is a use of so-called "less-lethal" force when use of potentially lethal force is permissible; it is potentially (and in some instances has actually been) a use of deadly force.

4

33.   Dogs trained like K-9 Beebs are invariably aggressive and as likely to inflict injury as any other weapon in the police arsenal other than firearms with live ammunition.

34.   The teeth of dogs like Beebs, up to three centimeters long, are highly likely to penetrate the flesh of a subject enough to cause neurovascular, tendon, and soft tissue injuries, including severe, disabling injuries and disfigurement from deep puncture wounds, lacerations, shredded or missing flesh, and damage to muscle or other tissues, nerve damage, mutilation and scarring.

35.   Medical literature demonstrates police K9 bites include deep puncture wounds, severe crush injuries, large tissue avulsions, lacerations and wounds that require surgical care, bony injuries ranging from cortical violations to displaced fractures, neurovascular damage and a high risk of wound infection.  Pineda GV, Managing Law Enforcement (K9) Dog Bites in the Emergency Dept., Academic Emergency Medicine, Apr. 1996, VOL 3/No 4, 352-358.

36.   The jaws of a large dog like Beebs can exert pressures of 450 pounds per square inch (psi) or more enough force to penetrate light sheet metal.

37.   Medical literature and studies have demonstrated that the bite forces of K-9 dogs are between 450 and 800 psi.

38.   Unlike police officers who are trained as part of their use of force training to recognize areas of the human anatomy Beebs was not trained to avoid biting vulnerable or vital areas of the body.

39.   Comparative studies have shown that in police departments with no mandate or policy regarding use of canines people attacked by police dogs require emergency room hospital visits four times more frequently than those subjected to Tasers or Stun guns and three times as often as those given baton strikes.

   The WPD Canine Policy

40.   At all times material to this complaint the WPD had "Worcester Police K-9 Guidelines," Policy and Procedure No. 401, dated October 19, 2017.

41.   During the same period of time the WPD also had a use of force policy (Policy 400, issued on August 10, 2018) setting forth a continuum model in the use of force geared to the degree or compliance or resistance by a subject interacting with police officers.

42.   The said Policy 400 describes techniques and criteria for the appropriate use of force, ranging from verbal instruction and warning to low-impact compliance techniques and up to chemical agents, impact weapons, and firearms.

43.     Policy 400 was silent as to where police dogs fit in the use of force continuum – nowhere in Policy 400 did the words "K-9" "canine" or "police dog" appear.

44.     However, the WPD K-9 policy ranked lethal and so called "less lethal" weapons as follows:

   A.  Firearm
   B.  Police Canine
   C.  O.C. Aeorosol Spray
   D.  Baton
   E.  Pepperball/40MM Gas Launcher
   F.  Electronic Control Device (Taser)
   G.  Less Lethal Shotgun
   H.  Tools of immediate means or opportunity
   I.  Personal Weapons, i.e., hands, feet, head, etc.

45.     The policy recognized the use of canines on people as second only to guns as to the level of force and danger and as a greater level of force than the use of any other tool or technique.

46.     Policy 401 expressly provided in paragraph 20 (A) that "[o]nly the amount of force that reasonably appears necessary to apprehend or secure a suspect shall be used.  Handlers and their dogs are required to adhere to procedures that properly control their potential use of force and channel their specialized capabilities into legally responsible crime prevention and control activities."

47.     Paragraph 20(B) of Policy 401 also provided: "Canine handlers are responsible for determining whether a situation justifies canine use and the appropriate special measures that should be taken."

48.     Paragraph 18 of Policy 401 provided that police dog handlers such as Officer Pennellatore "…[s]hall maintain complete control over their dogs to ensure the utmost safety to the public."

49.     WPD Policy 401 also provided that in crowd control situations – such as riot, imminent threat of riot, or other unruly public disturbance --canine teams could be deployed on orders of the Chief of Police, the Deputy Chief of Operations, or their designees, but they should "not be used as a primary means/tactic for controlling crowds."

50.     WPD Policy 401 also addressed allowable uses of canines in arrest situations. It required officers to assess the seriousness of the crime involved, the level of a suspect's resistance or threat to an officer, and the danger to the community the suspect posed.

51.     For purposes of criminal apprehension under policy 401, a K-9 handler must have probable cause to believe the suspect has committed a crime involving the use or threat of violence.

52. Policy 401 provided that whenever possible the K-9 handler "shall allow the suspect or suspects to surrender by giving a warning announcement prior to the release of a canine for the purposes of apprehension."

53. Under the Policy 401, once a canine has effectuated an apprehension (a euphemism for biting and holding a suspect) "the canine is trained to maintain the bite during any resistance provided by the suspect. The handler will immediately advise a suspect to stop fighting and/or resisting the canine and the handler will command the canine to release the suspect."

54. The policy also required that, where a canine was used in apprehension, "[o]nce a suspect has been handcuffed, and searched, the handler will ensure that the suspect is provided immediate medical attention for any injury sustained." *Id*.

55. In addition, under Policy 401, a dog handler like Pennellatore must report on the use of the dog and the injuries K-9 Beebs inflicted on the individual arrested.

56. Policy 401 also provided that when officers used lethal or less-lethal levels of force "a verbal report of the incident shall be made to officer's supervisor as soon as practically feasible."  See Policy 401 at ¶ 12. *Id*.

57. It was clearly established at all pertinent times by the stated policy and practice of the WPD that as a canine handler Officer Pennellatore was required to maintain command and control of K-9 at all times, including during use of the dog in apprehension.

### THE DISTRICT BAR INCIDENT OF MARCH 29, 2019

58. On March 29, 2019 at approximately 01:38 am, Officer Kevin McCarthy was working a bar detail at the District Bar at 107 Water Street Worcester.

59. A disturbance developed inside of the District Bar and Officer McCarthy proceeded to arrest an unruly patron who he alleged assaulted him, Concepcion Rodriguez.

60. Officer Brett Kubiak was assigned to the Emergency Operations Police (EOP) within the City and responded to the District Bar at the request of Officer McCarthy for back-up.

61. Concepcion Rodriguez ran away from the District Bar with Officer McCarthy and District Bar bouncers in hot pursuit.

62. When Kubiak arrived, he reported observing a group of people fighting and screaming in the middle of Water Street along with a group of officers attempting to arrest one Alex Calderon.

63. The District Bar bouncers were dressed in black clothing and ran to assist Officer McCarthy.

64.  Eric Rojas was inside of the District Bar when the disturbance started. He did not know Concepcion Rodriguez but had friends that apparently knew Concepcion Rodriguez.

65.  A video surveillance camera near the District Bar captured some of the events that occurred next.

66.  While Officer McCarthy attempted to arrest Concepcion Rodriguez on Water Street, some of Rojas' friends followed them across the street.

67.  Rojas followed his friends onto Water Street and he can be seen in the surveillance tape physically restraining them, pulling them away from the affray or trying to make sure his friends did not interfere with Officer McCarthy's arrest of Concepcion Rodriguez.

68.  Rojas was not far away from Officer McCarthy or the bouncers as McCarthy wrestled with Concepcion Rodriguez to apprehend him.

69.  One of the bouncers assaulted Rojas by pushing him away. Rojas pushed the bouncer away from him.  Rojas walked away from the bouncer despite the fact the bouncer was standing in a bladed position facing Rojas.

70.  Rojas did not assault or touch Officer McCarthy.

71.  As Rojas attempted to separate one of his friends from the incident, an individual, also dressed in black, approached Rojas from his left side.

72.  The individual was Officer Alwards, who was wearing a black fatigue uniform and a black baseball cap and did not identify himself to Rojas as a police officer.

73.  Rojas attempted to push one of his friends away from Officer McCarthy and Rodriguez when Officer Alwards pushed him away using his right hand.

74.  Rojas did not engage Alwards and walked away from him.  **Ex. 1.** (Still Photo from video surveillance).

75.  Almost simultaneously Officer Pennellatore arrived on the scene holding K-9 Beebs on a lead as part of crowd control.

76.  Pennellatore did not obtain prior authorization to deploy Beebs for crowd control.

77.  As Rojas walked away from Officer Alwards he witnessed the bouncer that had assaulted him seconds earlier forcefully assaulting one of his friends.

78.  Rojas pushed the bouncer back away from his friend in defense of his him and began to run away.

79.  Officer Alwards began running after Rojas.

80.     Rojas ran away from Alwards not knowing he was a police officer and came within feet of Officer Pennellatore and K-9 Beebs who aggressively barked at Rojas.  **Ex. 2.**  (Still Photo from video surveillance).

81.     Beebs was not wearing a dog muzzle

82.     Officer Alwards caught up to Rojas grabbed him by his shirt and slammed him against the back of an SUV parked on Water Street.

83.     Alwards was joined and assisted by Officer Thomas Bishop with Officer Pennellatore and canine Beebs directly behind them.

84.     Alward's and Bishop dragged and slammed Rojas onto the sidewalk causing Rojas to land on his belly.  That was when Rojas first realized the people chasing and assaulting him were police officers.

85.     Rojas immediately put his hands behind his back and at that time and felt a kick on his right eye.  In addition to being kicked, Rojas was punched with clenched fists repeatedly by Alwards and Bishop throughout his body.

86.     Pennellatore and Beebs remained in very close proximity to Rojas, Alwards, Bishop and a third officer joined and assisted but his name does not appear in any WPD reports.

87.     A video obtained from a hand-held phone shows Rojas on the ground restrained and one can also hear canine Beebs frantically barking within a few feet away from Rojas.

88.     Simultaneously, one can also hear an officer yelling to the crowd of bystanders "Get your shit out of here," and "back-off, back-off" repeatedly.

89.     No police orders are heard in this video instructing Rojas to stop resisting.

90.     Officer Pennellatore was grossly negligent and deliberately indifferent to Rojas by failing to inform him he was being arrested or to warn him before setting Beebs on him as required by WPD policy and acceptable police practices.

91.     As Beebs continued barking a police officer is heard saying "Hold them there." Almost simultaneously, Pennellatore without cause or justification or warning sicced Beebs onto Rojas while he was already prone and restrained by officers.

92.     Pennellatore knew that by siccing Beebs onto Rojas he would employ a use of force considered a very high level of force that would cause a substantial risk of serious injury.

93.     Beebs viciously bit Rojas in the left calf area.

94.    Rojas can be heard frantically screaming and wailing in agony at the top of his lungs for approximately 30 seconds as K-9 Beebs was tearing into his flesh. **Ex. 3**. (Still Photo from video surveillance).

95.    One of the video recordings shows Beebs mauling, ripping and pulling Rojas' left leg area as he laid motionless on the ground restrained by Alward and Bishop.

96.    Video surveillance shows Beebs biting Rojas despite having been handcuffed.

97.    Beebs repeatedly mauled Rojas for a period of approximately 30 seconds.

98.    Alward and Bishop had a duty to intervene and stop Pennellatore and Beebs from causing further grievous injury to Rojas.

99.    When a bystander complained to police "this is police brutality" Pennallatore warned the bystander to back-off or he would be next. **Ex. 4.**  (Still Photo from video surveillance).

100.   There was no legal justification for Officer Alwards, Bishop and Pennellatore's actions.

   **The False Police Narrative:**

101.   Officer McCarthy, Alward, Bishop and Pennellatore intentionally or recklessly prepared false and misleading police reports in connection with their interactions and arrest of Eric Rojas.

102.   All defendants had a legal duty to prepare complete and truthful reports.

103.   They were prohibited from fabricating evidence and framing Rojas for crimes he did not commit.

104.   Rojas did not assault Officer McCarthy but McCarthy, who is listed as the arresting Officer in a statement of facts, falsely alleged otherwise.

105.   McCarthy falsely wrote that Rojas "*began striking me with a closed fist to the back of my head. Police assistance then responded, Officer P. Alward then gained control of Eric Rojas, please see Officer Alward's supplemental report.*"

106.   McCarthy knowingly prepared a false report to enhance the criminal penalties and the chances of Rojas' criminal conviction and punishment.

107.   Alward falsely aligned his police report with Bishop's, Pennellatore's and McCarthy's to enhance the criminal penalties and the chances of Rojas' conviction and punishment.

108.   Alward falsely claimed Rojas was punching Officer McCarthy from behind while McCarthy was arresting Rodriguez.  He also intentionally or recklessly falsely claimed Rojas elbowed him when he pushed Rojas away from Officer McCarthy:

10

*"When I pushed Mr. Rojas away and yelled at him to get back, Mr. Rojas then stepped towards me in an aggressive manner looked directly at me breathing heavily and started to come at me with his hands raised with clench fists. I perceived these actions to be hostile and with his already assaultive behavior and fearing an attack was eminent, I struck Mr. Rojas several times in the upper body face and arm area with a closed fist. Mr. Rojas then started to fall back. When I felt I had interrupted his attack enough that distracted him away from me, I attempted to grab and place Mr. Rojas under arrest."*

109.   Alward's account is contradicted in large part by existing video surveillance.

110.   Like McCarthy and Alward, Pennellatore and Bishop intentionally or recklessly prepared false and misleading police reports.

111.   Pennellatore alleged, among other things, that he ordered Rojas to stop running, observed Rojas actively resisting, informed him *"...[h]e would be bit if he did not stop. Eric continued to actively assault Ofc. Alward and Ofc. Thomas Bishop at this time I applied K-9 Beebs on a direct bite to Eric's left calf. Eric continued to fight Ofc. Alward and Ofc. Bishop even after being apprehended* [a euphemism for being viciously bitten]' *Eric then began thrashing his own leg in an attempt to pull it away and break free from the K-9 bite, after approximately 30 seconds of continued struggling we were able to take Eric into custody. Once Eric was handcuffed I immediately took control of Beebs collar I asked Officers to clear a path for me to remove Beebs, I then gave Beebs his out command and he was immediately tactically removed from the apprehension."*

112.   Bishop also prepared a report aligned with his conspirators: the only partially accurate information he stated in his report was that he struck Rojas 2-4 times with a closed fist "as the K9 performed a controlled bite to this his leg…"

### Rojas suffered serious injuries

113.   Rojas was taken to UMass. Hospital for emergency treatment twice while in custody of the WPD

114.   He told medical providers that while being restrained by an officer a canine grabbed his left leg.

115.   Medical records show his left leg with multiple lacerations (5) and several smaller puncture wounds of the medial calf. all with extensive undermining and superficial muscle injury. Doctors found lacerations with superficial underlying muscle injury noted.

116.   Rojas was discharged with a diagnosis of significant left calf bite wound injury and multiple lacerations.

117.   Shortly after Rojas was mauled by Beebs, Pennellatore's called his direct supervisor in the K-9 unit, Sgt, Timothy Watts, and called WPD crime scene services to photograph Rojas' injuries at UMass. **Ex. 5**.

118.    Rojas' injuries were severe and while in the hospital he was going in and out of consciousness during his stay in the emergency room.

119.    Sgt. Watts, Pennellatore and Officer Jason Fanion were able to observe the serious nature of injuries inflicted by Beebs.

120.    Sgt. Watts was the commanding officer of the WPD K9 unit and had direct supervisory responsibilities over Pennellatore and his canine.

121.    He was responsible to make sure that Beebs deployment complied with policies procedures and constitutional standards.

122.    As a commanding officer of the unit Sgt. Watts should have known that the deployment of Beebs upon Rojas was unreasonable and unconstitutional.

123.    Pennellatore and Sgt. Watts direct chain of command was composed of Capt. Matthew D'Andrea and Deputy Chief Paul Saucier, none of which, according to Chief Steve Sargent have had any experience or involvement with K-9 units.

124.    Sgt. Watts did not request that the Worcester police Bureau of Professional Standards ("BOPS") conduct an investigation into Pennellatore's, Bishop, and Alward's use of force on Rojas.

125.    This demonstrates deliberate indifference on the part of the City and on the part of Sgt. Watts.

126.    The WPD incident report regarding Rojas' arrest shows that on April 1, 2019 Officer Kevin McCarthy "*received surveillance video evidence from investigative services of this incident. A copy of the video was logged in as evidence by the Detective Bureau and the additional copy will be held by the undersigned Court.*"

127.    Upon information and belief, this video was accessible to and viewed by Sgt. Watts, Pennellatore, Alwards, Bishop and McCarthy.

128.    Rojas' injuries were photographed at UMass as required by the WPD K-9 policy.

129.    These photographs were only for eyes within the WPD K-9 unit and were not circulated to police supervisors up the chain of command for review on the use of force so the command staff could, as policy required, assure officers used reasonable force and refrained from the use of unreasonable force.

130.    Rojas was eventually booked at the WPD; the booking was video and audio recorded, but on that occasion the audio not activated during critical portions Rojas' interactions with the booking officer.

131. During the booking process police were required to ask Rojas questions to comply with Massachusetts law, including questions about how he was injured, and they were required to inspect him for cuts and bruises. G.L. c. 276 § 33 entitled Examination of arrested persons for injuries; reports; penalty.

132. This statute, which the First Circuit Court of Appeals ruled the City violated during the late 1980s in *Wierstak v. Heffernan*, 789 F.2d 968 (1st Cir. 1986), places the officer in charge of the police department under a duty to examine a prisoner for bruises, cuts or other injuries and to "prepare forthwith make a written report to the chief of police…"

133. Rojas' serious injuries were not photographed by WPD booking officers to provide to the chain of command.

134. And none of the photographs obtained in accordance with the WPD K-9 policy by Sgt. Watts, or crime scene services, were seen or reviewed by Chief Sargent, his deputies or police trainers, who were responsible for ensuring that WPD officers used reasonable force.

135. Although Rojas' mauling was a critical incident at almost the highest level of force in the use-of-force continuum, no one in the chain of command including Chief Sargent became aware of his injuries or investigated how they occurred.

136. This demonstrates deliberate indifference on the part of the City, the Chief of police and City Manager to the rights of citizens subject to the use of force by WPD officers.

137. During their depositions in 2022 Chief Sargent and City Manager Augustus testified they were unaware of the existence of Rojas' case or the photographs of his injuries.

138. Chief Sargent trivialized and deflected the question of whether he thought Rojas injuries were serious, "*Once again, I'm -- it's not relevant. I don't know what would be considered serious unless I got the medical report and I could read it. I may still not understand.*"

139. Augustus also refused to characterize Rojas' injuries as serious despite their grotesque nature as revealed in photographs: "**It's hard for me to say, you know. There's some kind of wound but, again, how much of it is dried blood and what is the wound, I don't know**".

140. In viewing photographs of Rojas' leg Chief Sargent would only go as far as to admit that "*it looks bloody.*"

141. As a direct and proximate cause of Defendants' conduct, Rojas suffered physical and emotional injuries, had follow-up medical care, physical therapy, was cared for visiting nurses and lost his job and his apartment.

142. His emotional injuries manifested themselves in various ways, difficulties with sleep, fear, nightmares, anxiety and hypervigilance.

143.   Because of the damage to his leg caused by Beebs he was not able to weight bear on his left foot and had to climb stairs to his third-floor apartment on his buttocks.

144.   He also incurred medical expenses and has atrophy and a grotesque scar on his left calf. **Ex. 6**. (Photos showing scarring and atrophy).

## The Malicious Prosecution of Rojas

145.   Although the statement of facts in support of an application for a criminal complaint was signed by Officer Kevin McCarthy, Officers Bishop, Pennellatore and Alward also submitted false police narrative intentionally, knowingly, and maliciously to pile on Rojas' criminal case.

146.   Officer McCarthy, Bishop, Pennellatore, and Alwards' maliciously sought serious criminal charges against Rojas: Assault and Battery on a Police Officer, Resisting Arrest, and Disorderly Conduct and Disturbing the Peace.

147.   A charge of Assault and Battery on a police officer is a misdemeanor which carries a potential jail sentence of punished by imprisonment for not less than ninety days nor more than two and one-half years in a house of correction or by a fine of not less than five hundred nor more than five thousand dollars.

148.   A charge of resisting arrest caries punishment by imprisonment in a jail or house of correction for not more than two and one-half years or a fine of not more than five hundred dollars, or both.

149.   A charge of disorderly conduct is punishable by a fine of up to 6 months in jail and a fine of $200. Similarly, a charge of disturbing the peace is punishable a fine of up to $150. A second offense can result in up to 6 months in jail and a fine of up to $200.

150.   By the actions described above, Defendants deprived Rojas of the following clearly established and well-settled constitutional rights:

- Freedom from the use of excessive and unreasonable force;
- Freedom from summary punishment;
- Freedom from the deprivation of liberty without due process of law.

151.   Defendants subjected Rojas to these deprivations knowingly and maliciously.

152.   Rojas' criminal defense counsel obtained and examined the video surveillance of the incident and from private phones.  These videos contradicting the police narrative were provided to the District Attorney's Office of the Worcester District Attorney's Office.

153.    On September 29, 2021 the District Attorney's Office moved to dismiss three counts of the criminal complaints the Commonwealth brought against Rojas, resisting arrest disturbing the peace and assault and battery on a police officer, telling the court: "*Yes, Your Honor. After review of the case, and – and speaking with the officers, this would be the negotiated plea agreement that we made with the defense, in agreement with the Worcester police as well.*" **Ex. 7**.  (Plea Colloquium)

154.    Rojas made an admission to sufficient facts only as to the charge of disorderly conduct *Id.*

155.    Without the video surveillance evidence, Rojas faced the possibility of being found guilty and serving jail time.

156.    But despite damning evidence of excessive force and dishonest reporting, in accordance with their policy, practice, and usage, neither the City, police chief or City Manager sought to investigate the use of force or to discipline, McCarthy, Alward, Bishop or Pennellatore.

157.    On March 14, 2022, the WPD Bureau of Professional Standards announced it would conduct an investigation of Eric Rojas arrest. **Ex. 8**. (Letter Chief Sargent to Law Office of Hector E. Pineiro).

158.    Had it not been for the deposition of Chief Sargent in and City Manager Augustus in early 2022, appraising them of his case, no one would have ordered an investigation into Rojas' mauling and disfigurement.

159.    There was no legal justification for Pennellatore's actions and no reasonable officer would have released a vicious dog capable of biting an individual or causing serious bodily injury without reason or basis and without warning.

160.    Rojas' assault and mauling were unprovoked and constituted an egregious assault and battery and an unreasonable and unnecessary use of force in violation of plaintiff's well established constitutional rights.

161.    Officer Pennallatore's actions and his gross negligence and recklessness in control of K-9 Beebs caused Rojas' injuries.

**The mauling of Christopher Ayala Melendez**

162.    Other WPD canine have mauled City citizens and even police officers without serious consequences.

163.    On October 26, 2019 at approximately 12:33 am, Christopher Ayala-Melendez (Ayala-Melendez) was mauled by another WPD canine, K-9 Mattis, handled by officer Shawn Tivnan when Ayala-Melendez attempted to get inside of his apartment and requested permission to do so.

15

164. While Ayala-Melendez was talking to another officer in a peaceful and orderly manner, Officer Tivnan grabbed and forcefully pulled Ayala-Melendez across in front of him knowing his actions would trigger an attack by Mattis with resulting injuries.

165. Similarly to Rojas, Ayala-Melendez was charged with identical crimes by Officer Tivnan.

166. Similarly to Rojas, Officer Tivnan's police partners filed false police reports.

167. Similarly to Rojas, a video surveillance captured the encounter between Officer Tivnan, Mattis and Ayala-Melendez.

168. Similarly to Rojas and the officers that came in contact with him, Officer Tivnan, spun a fictional police narrative of the events that resulted in the criminal prosecution of Ayala-Melendez.

169. Similarly to Rojas' case, there was no legal justification for Officer Tivnan's actions.

170. Similarly to Rojas' case, Ayala-Melendez did not assault any officers.

171. Ayala Melendez did not break free from Tivnan, did not come towards Tivnan or towards K-9 Mattis in an aggressive manner nor did he assault or push Officer Tivnan as he had alleged in reports.

172. Similarly to Rojas' case, Officer Tivnan filed this false police narrative intentionally, knowingly, and maliciously.

173. Similarly to Rojas, Ayala Melendez was injured and received medical care.

174. Similarly to Rojas, on June 16, 2020 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Ayala Melendez without prejudice claiming "*The Commonwealth makes this request after a review of the currently available evidence in this case, including police reports and video surveillance tapes*."

175. The dismissal of Ayala-Melendez' criminal action occurred because there was no credible evidence or probable cause that he had committed any crime.

176. But unlike Rojas, in Ayala-Melendez the police investigated the allegations he made to the police during his booking that the use of force against him was unreasonable.

177. Rojas' horrific injuries did not raise any red-flags during his booking process.

178. On July 2020 Chief Sargent on the recommendation from investigators from the WPD BOPS exonerated Officer Tivnan of any excessive use of force claim made by Ayala-Melendez concluding: a) the bite was unintended and b) because there was a policy failure and because the K9 policy # 401 should be updated.

16

179.   Despite the existence of video surveillance that contradicted Officer Tivnan's account, the investigation ordered and supervised by Chief Sargent did not examine whether Officer Tivnan filed a false police report until after Ayala-Melendez filed a federal civil rights case against Officer Tivnan and the City and until August 5, 2020 when a local paper publicized the filing of the federal lawsuit.

180.   Chief Sargent reopened the investigation on August 5, 2020 days after newspapers reports only to conclude that Officer Tivnan had filed an "inaccurate" report.

181.   Even though it is a crime for police officers in Massachusetts to file false police reports Officer Tivnan was not charged with criminal conduct.

182.   Chief Sargent recently explained why Officer Tivnan was not criminally charged for preparing a false report and setting in motion the criminal prosecuting Ayala-Melendez: *"I believe it was a mistake of the head and not of the heart. I don't think he wrote a false report intentionally, but it was not accurate. It was not an accurate report to what happened that I could see. We didn't have the opportunity to interview the complainant.* [Mr. Ayala-Melendez]."

183.   The City Manager, in line with Chief Sargent, testified in early February 2022 he was unaware police officers can be criminally charged when they prepare false police reports, and the WPD have never charged a single Worcester officer who has been administratively found to have filed a false police report.

184.   That demonstrates deliberate indifference to the rights of citizens that come in contact with police.

185.   Despite Chief Sargent's musing about Officer Tivnan's state of mind when Mattis bit Ayala-Melendez on October 19, 2021, he also informed the Office of the District Attorney's Office that Officer Shawn Tivnan had "*lied about a defendant's conduct and thereby allowed a false or inflated criminal charge to be prosecuted.*" **Ex. 9**. (Document signed by Chief Sargent to the District Attorney's Office).

186.   On January 26, 2021 the City Manager provided Officer Tivnan with a Notice of Contemplated Discipline Hearing under MGL, c. 31§ 41 and requesting a forty (40) tour suspension alleging: "*It is clear from reviewing the video that your reporting of your interaction with Mr. Ayala-Melendez is not accurate. Once you pushed Mr. Ayala-Melendez toward Franklin Street, K-9 Mattis engaged Mr. Ayala-Melendez by biting his lower back. Mr. Ayala-Melendez did not, as you assert, come back toward you. When provided with an opportunity to amend your report in light of the video, you stood by your original account. **Conclusion** If the allegations contained herein are true, the forty (40) tour suspension is warranted.*" See, **Ex. 10.**

187.    Despite the City Manager's condemnation of Officer Tivnan's false reporting, he, like the Chief, and the BOPS chose not to go after Officer Tivnan for allowing a vicious dog to maul Ayala-Melendez by portraying the incident as *"...[a]n accidental byproduct of the interaction. It wasn't, at least from what I could tell, an order to the dog, bite or attack, or anything of that nature."*

188.    Despite exonerating itself from wrongdoing by claiming there was a policy failure, to be sure, to a policy that Chief Sargent promulgated in 2017, to this day the City has not amended policy 401, its October 19, 2017, K-9 Guidelines despite the City's acknowledgment of its deficiencies.  (See ¶178).

**Policy of the City of Worcester and Mr. Augustus and Chief Sargent**

189.    At all pertinent times the City of Worcester, Chief Sargent and Mr. Augustus observed a policy, custom, and practice in the Worcester Police Department that allowed officers, including Officers McCarthy, Alward's, Bishop, Pennellatore and others to employ unreasonable force, violate civil rights and engage in misconduct.

190.    At all pertinent times the said parties observed a policy, custom, and practice of failing to discipline officers who violated the rights of citizens.

191.    The WPD Bureau of Professional Standards ("BPS") in charge of investigating violations to the policies and procedures of the police department, including those on excessive force, invariably credited police testimony over civilian testimony.

192.    The BOPS largely and often ignored credible allegations and evidence of police misconduct.

193.    The WPD rarely, if ever, affirmed or sustained citizen complaints of unreasonable force by members of the WPD.

194.    In the lion's share of investigations in which citizens alleged unreasonable force the officers were exceptionally cleared of any wrongdoing.

195.    The internal investigatory process and practices of the WPD do not comply with acceptable and professional police practices.

196.    By way of example, up until very recently, the BOPS investigatory on instructions from the Chief of Police permitted police officers accused of wrongdoing to submit written statements without participating in in-person interviews, while complainants were subject to adversarial interrogation by WPD officers.

197.    The net effect of this faulty deliberative investigatory policy resulted in automatically clearing officers of excessive force complaints where complainants would not submit to personal interrogation, even when criminal charges were pending against them.

198.    Acceptable investigatory practices require, except in cases of minor procedural violations, that all interviews of police officers accused of violations to the WPD policies and procedures should be conducted in person, that they be recorded and transcribed.

199.    Without in person interviews of officers accused of misconduct the City and police administrators cut off an important investigatory avenue to collect all relevant facts.

200.    Up until very recently the policy that permitted investigations to proceed without requiring in person interview of officers allowed officers investigated of misconduct to generate vague, perfunctory use of force reports or injured prisoner reports conveying an impression of oversight while the reports in fact did not enable substantive review of officers' conduct by police administrators.

201.    These policies, customs or practices led police officers including Officer McCarthy, Alward, Bishop, Pennallatore, Tivnan and others to believe they were the above the law, that they could violate the rights of citizens because they knew they would not be disciplined.

202.    Upon information and belief, despite its written policy the City of Worcester, the Chief and Mr. Augustus permitted an unconstitutional policy, custom and practice that allowed the unreasonable use of police K-9 to bite and attack citizens and took no steps to monitor and control or regulate such extraordinary use of force.

203.    This policy arose in part from deliberate indifference, as well as result from profound ignorance on were canines fall in the use-of-force continuum. For one, Chief Sargent believes and has testified dog bites and baton strikes are somewhat functionally equivalent. He has testified: "*I mean, is a bite worse than getting hit by a stick or a baton, it's – they both can do damage.*"

204.    Sargent believes canine bites do not constitute a higher use of force than the use of pepper spray.

205.    The City of Worcester, the Chief and Mr. Augustus failed to adequately train, supervise, control, monitor and discipline officers, including McCarthy, Alward, Bishop, Pennallatore, Tivnan and others in the use of force and in the use of K-9 dogs to apprehend persons.

206.    Upon information and belief, the City of Worcester, the Chief and Mr. Augustus failed to track or to require tracking of canine deployments and canine apprehensions and failed to regularly evaluate such incidents and injuries arising therefrom so as to properly assess and control its canine unit and individual canine teams.

207.    The City of Worcester, the Chief and Mr. Augustus knew at all pertinent times that canine bites cause serious injuries and that there was an obvious need to train both handlers and canines to assure the appropriate use of force, and that failure caused violations of the rights of citizens who came in contact with WPD K-9's.

208.    The City of Worcester, the Chief and Mr. Augustus failed to provide for and require training of officers, including Officers McCarthy, Alward, Bishop, Pennallatore, Tivnan and others, in the proper use of force.

209.    At all times pertinent hereto the City of Worcester, the Chief and Mr. Augustus observed a policy, custom, and usage of failing to exercise discipline and control over the use of force by police officers, demonstrating deliberate indifference to the rights and safety of citizens.

210.    The aforesaid policy, custom and usage allowed officers to operate in the field with little supervision and without effective monitoring and at all times pertinent hereto the defendants McCarthy, Alward, Bishop, Pennallatore, Tivnan and others were aware that this was the case.

**A policy of police impunity regarding unreasonable force and duplicity**

211.    As of today, Officers McCarthy, Alward, Bishop, Pennallatore, Tivnan and others had little reason for concern about possible discipline or criminal liability for using excessive force or lying.

212.    The failures of the City of Worcester, the Chief, Mr. Augustus, and his predecessors to monitor and control officers' use of force was readily apparent from the results of past citizen complaints to the WPD claiming excessive force.

213.    By way of example and not limitation both Sargent and Augustus knew of the following disturbing cases and failed to fire or discipline officers they knew deserved to be booted out of the WPD.

214.    Both knew of the case of Officer Rodrigo Olivera who seriously assaulted a 15-year-old mentally ill handcuffed boy at a local clinic who was being transported for a psychiatric assessment to a local hospital.

215.    The complaint was sustained only because it was witnessed by a clinician and the forty-day suspension memorialized in a last chance agreement trivialized the fact that the officer had been found to use excessive force and been untruthful.

216.    No criminal charges were brought against Officer Oliveira for punching a handcuffed teenager.

217.    Both knew of the case of Officer Ryan Joyal who on or about July 21, 2020 was videotaped by a civilian smacking a mentally ill individual strapped to a gurney while being transported by police and ambulance personnel for a psychiatric exam at local hospital.

218.    Both knew Joyal lied in his police by failing to disclose that he assaulted the individual.

219.   Both knew he was force to correct the next day the police report, only to report it as "an open hand distraction," a cop euphemism for an assault and battery.

220.   Joyal was not tagged or discipline for excessive force or even for filing a false report. Instead, he was given a slapped of the wrist, a less than a week suspension not even for filing a false report but rather for "failure to report use of force."

221.   In any event, Joyal brief slap of the wrist suspension resulted in a mini-police insurrection when 14 to 15 brother officers who worked his shift decided to call in sick on the day Joyal was supposed to begin his suspension to protest his toothless punishment.

222.   No one has been disciplined for this episode.

223.   Both knew the case of Officer James J. D'Andrea, a connected cop who got a 60-day work suspension for driving drunk, crashing his car, leaving the scene of an accident and lying about the circumstances of the incident, alleging "a deer had run in front of his pick-up truck," a story no one believed.

224.   Both knew of another case in which, a statement of facts from a Worcester County District Court alleged and charged a Worcester cop with a home invasion after he "climbed into the home breaking a couple of blinds while doing so" and assaulting the male companion of his ex-wife.

225.   That event resulted in a 60-day work suspension signed by Augustus and former Chief of Police Gemme.

226.   Other cases for which no discipline was meted involve *Beshai et al, v. Alers, et al*, Case No. 4:20-cv-401157-TSH, Dkt. 18-1, (D. Mass. March 17, 2021)(involving the arrest and injury of a 10-year-old autistic boy who underwent surgery- an open reduction/internal fixation of the right medial epicondyle fracture), or *Agyeah v. City of Worcester, et al,* Case No. 4:21-cv-40020 Dkt. 5, (D. Mass. Feb. 19, 2021)(involving a fabrication of charges including assault and battery, resisting arrest, breaches of peace against a Black Uber driver who one of the Defendants referred to as "Is this how you fucking monkeys treat your police officers?").

227.   The policy, practice, and usage of the City, Chief of Police and Mr. Augustus of impunity for the use of excessive force and other police misconduct is further evidenced by events following the mauling and arrest of Mr. Rojas in March of 2019 and the arrest of Mr. Ayala-Melendez in October 2019.

228.   On June 1, 2020 members of the WPD arrested more than ten (10) bystanders who were peacefully observing or filming interactions between protesters and the WPD in the aftermath of a downtown George Floyd, Black Lives Matter demonstration.

229.    Despite the fact that it has been firmly established for years in our federal circuit and courts that civilians have the right to video record the police, members of the WPD were not interested in being recorded by anyone.

230.    A cell phone video shows a Worcester police officer purposely stomping on the phone of a student in order to destroy footage of the arrest. *See* https://www.telegram.com/news/20200627/video-appears-to-show-police-stomping-on-clark-grads-smartphone-after-riot-arrest

231.    That same day, a Worcester photojournalist, Richard Cummings was unlawfully arrested by a group of officers and threatened him for documenting their conduct. The arresting officers never revealed their names in reports.

232.    Cummings was arrested shortly after filming and speaking with Lt. Doherty who cleared him to be there after he explained he was a photojournalist.

233.    A video from a City of Worcester traffic surveillance camera shows Cummings leaning against a retaining wall when he was arrested by three officers at the intersection of Main and Hammond Street.

234.    He was tackled to the ground, force used, his arms twisted, called a "faggot" and an officer screamed about breaking his arms and threatening that he would be beaten by "spics" that had been arrested and waiting to be transported with him in a police transport vehicle.

235.    His phone was confiscated and some of the videos he had obtained were deleted when his phone was finally returned back to him later on that evening.

236.    The arrest report prepared by one of the Officers in charge, Lt. David P. Doherty, falsely alleged, "*At one point the Tactical Patrol Force was holding a line across (sic) main street and Hammond Street when a Richard Cummings made his way past the front line following orders to disperse. Cummings was taken into custody by Operations officers who were holding a position at the rear of our lines.*"

237.    A City surveillance camera shows Cummings leaning against a retaining and not past the police front lines following orders to disperse. See **Ex. 11.** (Still photographs from City surveillance cameras showing his position and the 3 officers that arrested him from www.telegram.com/videos/news/2021/03/16/richard-cummings-trained-photojournalist-arrested-police-george-floyd-protests-main-south-worcester/4723262001/

238.    Nine months after Cummings' arrest, his criminal lawyers learned from discovery in his criminal case that one of the individuals that arrested him was Sgt. Jarret Watkins, whose name was not mentioned in Cummings arrest report.

239.    That same day police arrested Javier Amarat whose unlawful and fabricated arrest was captured by him in during a Facebook livestream he was doing.

240.   His livestream contradicts the false narrative of two police officers responsible for his arrest.  His phone confiscated by police was also stolen by the arresting officers who carried it for close to an eleven minute period during which times they are heard arresting another person.

241.   A police investigation exonerated both officers, and Chief Sargent informed Amarat, "*We were unable to determine who took possession of your cell phone*."

242.   Another person arrested was Veronica Pasquantonio, a New Bedford mother who was punched by police in the forehead, called a "nigger-lover" and was repeatedly hit by a WPD officer with a police baton.

243.   Although she reported being hit with a police baton in her legs, was offered medical care and appeared injured during booking, her arrest report did not mention police utilizing a baton to arrest her.

244.   Her arrest was described in the most pedestrian manner, "*Veronica Pasquantonio was taken to the ground and was given several commands to stop resisting and place her hands behind her back. At this time, I Nathan Lafleche straddled the rear of her to prevent further kicking. Pasquantonio was then secured in handcuffs (DL) and brought to a waiting patrol wagon for processing*."

245.   Another person was arrested by police during the George Floyd protest was Christopher Euga, who on arrival to the WPD station told a booking officer when questioned how he got injured (Euga had visible injuries to both eyes who appeared to be black-blue from being punched) he gestured to police with his hands he was punched by police during the arrest.

246.   A report prepared by Officer Lopopolo also described Eugas' arrest in pedestrian terms: "*Most of the group began to disperse walking North on Main St. Christopher Euga refused to leave despite numerous commands to and began to advance towards officers. At this time myself and other officers attempted to place Euga in handcuffs and under arrest. I ordered Euga to place his hands behind his back but he refused to do so and pulled away from us. We were eventually able to place him in handcuffs. He was transported to the station via wagon.*"

247.   Police at that time also arrested and assaulted several other bystanders who had committed no offense other than being present including Lindsey Demanbey who appeared to be clearly injured and bleeding during his booking.

248.   The arresting officer Sgt. Ryan J. Maher wrote a fictional report contradicted by a video camera: "*Based on the abovementioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under*

*arrest. Lyndsay Demanbey was among those who refused to disperse by remaining in the roadway and as such was taken into custody by the Tactical Patrol Force."*

249.   The Chief, the City and the City Manager completed a perfunctory and grossly negligent investigation that exonerated all police officers of duplicity and the use of excessive force.

250.   Nowhere in the text of the investigation it mentioned or discuss the names or allegations made by Richard Cummings, the video tape of his arrest, by Christopher Euga or from Veronica Pasquantonio.

251.   Chief Sargent cleared every officer from allegations of excessive use of force and exonerated every officer because of a so called "Policy Failure" including the writing of false police reports.

252.   On March 19, 2021 all charges against approximately nine defendants were dismissed or nolle prosequi by the Worcester District Attorney's Office.  The First Assistant District Attorney noted in a statement that the cases were dropped after an office review concluded there was insufficient evidence to continue prosecuting.

253.   On February 1, 2022 the City Manager was asked to express his reaction to the dismissal of criminal charges during the George Floyd protests of June 1, 2020.

254.   His response was classic exercise of burying his head in the sand: *"I don't know if I had a reaction, you know. Cases, you know, the courts deal with the cases as they see fit, or the DA's office as he sits fit, so I don't know if I had a reaction."*

255.   City Manager Augustus when questioned in his capacity as conservator of the peace in the City whether he monitored the progress of that particular investigation he responded: *"You know, I keep it a very high level of conversation with the chief but I don't get into the minutia of any investigations."*

256.   Despite these shocking revelations the reaction by City of Worcester, its Chief of Police and the City Manager have been astonishingly tolerant.

257.   Although citizen shot videos provided irrefutable evidence of police conduct, after a trial of body cameras worn by police officers, in July WPD Chief Steven M. Sargent, effectively killed any chance that officers would be required to wear body cams.

258.   Sargent parroted the sentiments of the rank and file: body cameras would make some officers feel "pressure to maintain the demeanor of someone testifying in court" and that it "has the potential to hurt officers' enjoyment of their jobs, and to reduce community engagement."

259.   Sargent also stated if officers had to wear body cams "some officers might be less willing to engage in proactive policing when they are afraid that every mistake they make has the potential to subject them to public criticism" and might become hesitant to use necessary

force because due to concern over being criticized by the media."

260. Sargent's comments are further evidence of the policies, practices, and usage of the WPD, the City and of Mr. Augustus of allowing police to use force without effective oversight, accountability and where appropriate discipline or criminal prosecution.

261. These policies, customs and practices of the City of Worcester, of its Chief of Police and Mr. Augustus were the moving force behind the violations of Rojas' constitutional rights committed by Officer McCarthy, Alward's, Bishop and Pennellatore.

## COUNT I
## 42 U.S.C. § 1983 unreasonable force
## Officer Pennellatore, Alward, Bishop - Individually

262. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

263. Pennellatore, Alward, and Bishop acting under color of law used unreasonable force against Rojas depriving him of his clearly established right to be free from the use of unreasonable force under the Fourth Amendment.

264. Officers Pennellatore, Alward and Bishop seized Rojas unlawfully when they, without warning deployed  K-9 Beebs on him to attack him.

265. Defendants Pennellatore, Alward and Bishop acted jointly with one another to violate Rojas' constitutional rights.

266. Pennellatore's use of force was egregious because Rojas was not given an opportunity to comply prior to K-9 Beebs' deployment, was unarmed, cooperative and made no threat by word or act to any person or to the dog.

267. In addition, Defendants Alward and Bishop had a duty to intervene and protect Rojas from being mauled by K-9 Beebs but they intentionally failed to do so.

268. As a direct and proximate result of Defendants' actions, Rojas suffered damages grievous bodily injuries and was harmed.

## COUNT II
## Assault & Battery, K-9 Beebs by Officer Pennellatore

269. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

270. Officer Pennellatore committed an assault and battery with, Beebs when he released and directed Beebs to viciously attack and maul Rojas without reason or cause.

271.   As a direct and proximate result thereof, Rojas suffered grievous bodily injury and was harmed.


## COUNT III
## Assault & Battery
## Officer Alward and Bishop


272.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

273.   Officers Alward and Bishop committed an assault and battery against Rojas without reason or cause.

274.   As a direct and proximate result thereof, Rojas suffered injuries and damages.


## COUNT IV
## Conspiracy (State civil conspiracy and under 42 U.S.C. § 1983
## Defendants Officer McCarthy, Alward, Bishop and Pennellatore


275.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

276.   Defendants Officer McCarthy, Alward, Bishop and Pennellatore, tacitly or explicitly, conspired to use excessive force against Mr. Rojas, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest Rojas.

277.   Their purpose was to physically assault and bater Rojas and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

278.   As a direct and proximate result thereof, Rojas suffered damages as set forth herein.


## COUNT V
## Malicious Prosecution/Officer McCarthy, Bishop, Alward and Pennellatore


279.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

280.   Officers McCarthy, Bishop, Alward and Pennellatore caused criminal charges to be brought against Ayala Melendez for which there was no probable cause, and they

maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

281.   On September 29, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Rojas on the Assault and Battery of a police Officer, for Resisting Arrest, and Disorderly Conduct.

282.   The dismissal of Rojas' criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

283.   As a direct and proximate result thereof, Rojas lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT VI
## 42 U.S.C. § 1983, City of Worcester, Monell Liability

284.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

285.   The individual WPD Defendants' violations of Rojas constitutional rights were caused by the policies and customs of the City of Worcester as described above.

286.   By its acts and omissions in response to repeated incidents of unnecessary police violence the City demonstrated deliberate indifference to the rights and safety of persons coming into contact with WPD officers.

287.   As a direct and proximate result thereof, Rojas suffered damages as set forth herein.

## COUNT VII
## 42 U.S.C. § 1983, Mr. Augustus and Chief Sargent

288.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

289.   At all pertinent times Mr. Augustus was as a matter of law the keeper of the peace in the City of Worcester and as the City's chief executive had authority over the policy, practice, and usage of the City and the WPD regarding the use of force by police officers and their reporting of and accountability for the same.

290.   At all pertinent times hereto Sargent, as Chief of Police, exercised authority over the WPD and its officers and was a maker of policy as to standards of conduct and discipline within the WPD, and he had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority, and duty to hold officers

accountable for any use of excessive or unjustified force and for misstatements of fact in official reports.

291. Besides this authority as policymaker at all pertinent times Mr. Augustus had authority over the hiring and firing of WPD officers and the WPD standards and practices of discipline and accountability.

292. At all pertinent times both Chief Sargent and City Manager Mr. Augustus knew that without effective control of the use of force by police citizens are subject to violation of their constitutional rights, injury, and in some cases fatal injury.

293. Notwithstanding the foregoing, as alleged herein both Chief Sargent and City Manager. Augustus observed and maintained a policy, practice, and usage of allowing *de facto* immunity to officers who physically abuse or injury persons in violation of their rights under the U.S. Constitution and he was at all pertinent times deliberately indifferent to the rights and safety of persons coming into contact with members of the WPD.

294. By their acts and omissions in response to repeated incidents of unnecessary police violence Chief Sargent and City Manager Augustus demonstrated deliberate indifference to the rights and safety of persons coming into contact with WPD officers.

295. As a direct and proximate result thereof, Rojas suffered damages as set forth herein.

### COUNT VIII
### Intentional Infliction of Emotional Distress
### Officers: McCarthy, Alward, Bishop and Pennellatore

296. Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

297. The conduct of the Defendants named in this count constituted intentional infliction of emotional distress,

298. By their actions, Defendants subjected Rojas to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury

299. As a direct result of the intentional conduct of the defendants in this count, Rojas suffered severe emotional distress and great pain of body and mind.

### DEMANDS FOR RELIEF

The Plaintiff hereby respectfully requests the following relief:

1.      All compensatory damages recoverable;
2.      Injunctive relief;
3.      All punitive damages recoverable;
4.      All attorney's fees, costs and expenses allowable;
5.      Joint and severally liability as to all defendants;
6.      Strict liability against the owner and handler of the dog for the injuries caused;
7.      All remedies available according to the law of damages for the plaintiff;
8.      Any and all other relief as the Court deems just and proper.

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT</u>

Respectfully submitted,
ERIC A. ROJAS-RODRIGUEZ, Plaintiff
By his attorneys,

*/s/ Hector E. Pineiro*

_____
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

*/s/ Joseph F. Hennesey*

_____
Joseph F. Hennessey, Esq.  BBO#669552
Law Offices of Joseph F. Hennessey
807 Main Street
Worcester, MA 01610
Tel: 508 881-9500
j@hennesseylaw.net

DATED: March 28, 2022